**David MEUSER, Plaintiff**

v.

**FEDERAL EXPRESS CORPORATION, Defendant.**

**No. C.A. 06–30042–MAP.**

United States District Court, D. Massachusetts.

Dec. 14, 2007.

are unnecessary to the holding in this case.

sachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12 §§ 11H, 11I (Count I), and of the common law prohibition against a discharge in contravention of public policy (Count III).[1]

Defendant has moved for summary judgment, contending that the facts, even when viewed in the light most favorable to Plaintiff, could not support a reasonable jury in concluding that any action was taken against Plaintiff via "threats, intimidation or coercion" as required by the Massachusetts Civil Rights Act, and that Plaintiff never suffered a constructive discharge.[2] For the reasons set forth below, the court will allow Defendant's Motion for Summary Judgment.

## II. FACTUAL BACKGROUND

The facts are viewed, as required by Fed.R.Civ.P. 56, in the light most favorable to Plaintiff. Although many facts are offered by both sides, this summary will concentrate only on the facts material to the court's decision.

Plaintiff began working for FedEx in April 1992. The events underlying this case commenced in roughly October 2002, when Plaintiff noticed fumes in his delivery truck. Ultimately, Plaintiff made a visit to the hospital and was out of work for three days as a result of his exposure to the fumes. Plaintiff filed a Safety First Report with FedEx and a worker's compensation claim. He received compensation for his medical expenses and days off. On October 21, 2002, he contacted the Occupational Safety and Health Administration ("OSHA") to request an investiga-

Dan Vernon Bair, II, Lisa Brodeur–McGan, Brodeur–McGan, P.C., Springfield, MA, for Plaintiff.

Kathy Laughter Laizure, Federal Express Corporation, Memphis, TN, Laura M. Raisty, Morgan, Brown & Joy, LLP, Boston, MA, for Defendant.

***MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 13)***

PONSOR, District Judge.

## I. INTRODUCTION

This is an action by a former employee of Defendant Federal Express Corporation ("FedEx"), claiming violations of the Mas-

---

1. Count II, alleging intentional infliction of emotional distress, has been dismissed by agreement.

2. Defendant raises a number of other arguments, including an absence of any violation of civil rights and a failure to file with the applicable limitations period. Because the arguments with regard to "threats, intimidation or coercion" and with regard to the absence of any discharge (constructive or otherwise) are overwhelming, the court need not address these additional contentions.

tion into the fumes. OSHA found that the hazard had been investigated, identified as a leaking pump, and had been corrected. Plaintiff then asked his supervisors for the Material Safety Data Sheet ("MSDS") containing the safety information regarding the faulty pump that was believed to have caused the fumes. After some time, the MSDS was obtained from the vendor, and OSHA cited FedEx for not having the MSDS on site, but did not impose any penalty. One of Plaintiff's supervisors, Joe Marotta, was gruff with Plaintiff about his fume-related complaints, and accused Plaintiff of fabricating the incident in order to sue FedEx. Following the citation by OSHA, Marotta told Plaintiff, "I don't like to lose."

In February 2003, Plaintiff contracted a respiratory illness and eventually received one week's leave under the Family Medical Leave Act ("FMLA").

Also in February 2003, Plaintiff's FedEx route was changed as a part of a comprehensive overhaul of courier assignments. The re-routing had been planned since November 2002. It resulted in a larger geographical area for Plaintiff, but required fewer stops per hour.

In March 2003, Plaintiff's truck ended up in a snowbank and had to be towed out. One of Plaintiff's supervisors asked him to write a report regarding the incident, and Plaintiff felt that this requirement singled him out from other couriers. However, he was not disciplined for this incident.

In April 2003, Plaintiff contacted his supervisor to request a replacement truck because the one he was driving was "dusty." Marotta and Langone suspected this complaint was merely a tactic to get someone to bring Meuser a package that

had been left behind at the station that morning so he would not have to return for it. At a meeting on April 18, 2003, Marotta told Plaintiff that he thought this complaint was "bullshit," and that Plaintiff needed to put his "big boy pants on." Plaintiff was given an online counseling,[3] the first step in FedEx's progressive discipline process, for failing to take the package on his route.

On April 16, 2003, Plaintiff used his truck dispatch system to send another courier, Deb Dahlgren, a threatening communication. Plaintiff accused Dahlgren of falsifying documents and concluded, "I've had enough ... The antagonism and the provocation have got to stop ... and I will decide if I feel that it has ... that choice is yours." (Meuser Dep., Ex. 36 (*quoted in* Dkt. No. 27, Def.'s Reply Mem. in Support of Mot. for Summ. J. at 6) (ellipses in original).) Plaintiff received a documented counseling for his disruptive conduct.

In August 2003, Plaintiff submitted a request for tuition reimbursement under a FedEx plan that provided this benefit in certain situations. He had been previously told he would receive the reimbursement. There was some initial delay and opposition to his request, but the reimbursement was paid in November 2003.

In September 2003, Plaintiff was assigned a package for delivery that was misaddressed to Shelburne Falls, Massachusetts when it should have been addressed to Ashfield. Plaintiff was aware that on his rural route some residences had a physical location in one town but a mailing address in another. He knew very well where this package was to be delivered, despite the incorrect address, but he improperly classified the package with a

---

**3.** Defendant denies that "counseling" constitutes a form of discipline. For purposes of Defendant's Motion for Summary Judgment, however, the court has accepted Plaintiff's representation that it is.

"Delivery Exception 3" code, which was only appropriate when the courier actually did not know where to deliver the package. As a result, there was a delay in getting the package delivered. When the customer, one Emily Robertson, complained that she had not received her package, Plaintiff was instructed by his FedEx supervisor to deliver the package and to attempt to placate Ms. Robertson. When Plaintiff did this, he took the opportunity to complain that he had been late because the station was short-handed, and pointed to the many packages in his truck which he said he would not be able to get to during his delivery day. Ms. Robertson complained to Plaintiff's superiors that the tenor of his comments intimidated her and that she felt threatened. Indeed, in a written complaint covering a range of issues causing unhappiness with FedEx, she even made reference to being concerned that Plaintiff might return and commit a drive-by shooting against her. Based upon this report by a customer, FedEx supervisors shifted Plaintiff to a different route and placed him on paid investigative suspension.

Following the investigation, Plaintiff was issued a warning letter as a result of his improper use of the delivery exception code and his inappropriate conversation with a customer. Plaintiff claims that his assignment to a new route was inconsistent with FedEx's ordinary policies and was unprecedented.

Subsequent to his assignment to the new route, Plaintiff contacted a number of Defendant's customers whom he happened to know personally and asked them to write to FedEx complaining about Defendant's decision. Based upon Plaintiff's descrip-

tion of the situation, according to Plaintiff, the customers were "horrified" at Defendant's decision to put Plaintiff on a new route. Plaintiff received a second warning letter on September 25, 2003, based upon his unfavorable statements to Defendant's customers. Ultimately, his three-day paid investigative suspension was converted to an unpaid suspension. Despite this, Plaintiff continued on his new route with no other change in pay or benefits.

Plaintiff challenged the warning letters received from Defendant through Defendant's "Guaranteed Fair Treatment" process and later through its internal EEO procedures, but the result at the conclusion of this process was that the discipline against him was confirmed.

On September 11, 2003, one of Plaintiff's supervisors issued a memorandum to Plaintiff indicating that his attendance had dropped below an acceptable level, citing nine absences, mistakenly including one from February 14, 2003, which was a legitimately approved FMLA leave day.

On November 17, 2003, Plaintiff submitted two letters to his supervisor. One requested his personnel file under Mass. Gen. Laws ch. 149, § 52C, and the other asked for a written statement as to why his tuition reimbursement had, as of that day, still been delayed. In a subsequent meeting with supervisors, Lisa Patterson (who had replaced Marotta as senior manager), told Plaintiff that she felt the letters were disrespectful in tone. According to Plaintiff's version of the incident, Patterson slammed her hands on the table and shouted at Plaintiff that this "would not be tolerated." Plaintiff was terrified at Patterson's reaction and withdrew his letters.[4]

---

4. It is unclear from the record whether Meuser intended to withdraw his request for his personnel file or his request for an explanation of his tuition reimbursement denial. At his deposition, Plaintiff merely testified that

"I actually took the letter and I said okay, I withdraw the letter," without specifying which letter it was. (Dkt. No. 27, Ex. 2, Meuser Dep. 141:2–145:20.) Though this statement occurred during a discussion of

At the time of the incident, Patterson had been working only two weeks and had only minimal knowledge of Plaintiff's history, and no knowledge of the fumes-related OSHA incident.

On November 24, 2003, Plaintiff resigned from his position effective December 5, 2003. He claims now that he thought he was on the verge of being terminated anyway and had been told by a supervisor that he might be eligible for rehire by FedEx if he resigned. Subsequently, Plaintiff learned that, in fact, he would be ineligible for rehire because of his two warning letters. Based upon this knowledge, approximately one day after submitting his resignation, Plaintiff attempted to rescind it, stating that he wished to return to his job. Defendant declined to accept the rescission, and the employment relationship ended.

## III.  DISCUSSION

Summary judgment is appropriate only if, viewing all factual disputes in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would prevent judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Montfort–Rodriguez v. Rey–Hernandez*, 504 F.3d 221 (1st Cir.2007). A genuine issue exists where "a reasonable jury could resolve the point in favor of the nonmoving party." *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir.2000).

■ To sustain a claim under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11H, a plaintiff must demonstrate that "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or the Commonwealth, (2) has been inter-

fered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Bally v. Northeastern Univ.*, 403 Mass. 713, 532 N.E.2d 49, 51–52 (1989). Under MCRA,

a threat consists of the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.... Intimidation involves putting in fear for the purpose of compelling or deterring conduct.... Coercion is the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.

*Haufler v. Zotos*, 446 Mass. 489, 845 N.E.2d 322, 335 (2006) (internal quotation marks and citations omitted). On the facts set forth above, no reasonable jury could conclude that Defendant's conduct towards Plaintiff constituted "threats, intimidation or coercion."

■ With one exception addressed below, the record is entirely devoid of anything resembling the sort of physical, moral, or economic pressure that courts have found sufficient to support a claim under this statute. While an earlier requirement for some physical confrontation underlying the alleged intimidation has recently been relaxed, *see Buster v. George W. Moore, Inc.*, 438 Mass. 635, 783 N.E.2d 399, 411 (2003), the exception for claims based on non-physical coercion remains a narrow one. *See Horne v. City of Boston*, 509 F.Supp.2d 97, 115 (D.Mass.2007) ("Although there may be circumstances in which a showing of economic coercion, standing alone, may be actionable under the MCRA, almost all of the reported cases involve an element of physical force

Meuser's tuition reimbursement, the court will construe the facts in the light most favorable to him as the nonmoving party and assume that at the time he intended to withdraw both letters.

or confrontation."); *Buster,* 783 N.E.2d at 411.

Furthermore, courts have been particularly sensitive to the danger of turning the state civil rights statute into an open-ended vehicle to obtain a remedy for general tortious activity. *See Freeman v. Planning Bd.,* 419 Mass. 548, 646 N.E.2d 139, 149 (1995) ("We have recognized that by the Civil Rights Act, the Legislature did not intend to create a vast constitutional [and statutory] tort, ... and that the insertion by the Legislature of the requirement of threats, intimidation or coercion was specifically intended to limit liability under the Act.") (citations and internal quotation marks omitted). In particular, courts have been concerned about the application of MCRA in the workplace, where some amount of friction, unpleasantness, and even occasional shouting, is not unusual. *See French v. United Parcel Serv.,* 2 F.Supp.2d 128, 133 (D.Mass.1998) (holding a threat of adverse employment action to be insufficient to sustain a MCRA claim) (citing *Webster v. Motorola, Inc.,* 418 Mass. 425, 637 N.E.2d 203 (1994)); *Marsman v. W. Elec. Co.,* 719 F.Supp. 1128, 1138 (D.Mass.1988) ("[T]he 'threats, intimidation, and coercion' requirement of the Massachusetts Civil Rights statute will not routinely be inferred in the typical employment dispute.") (*citing Mouradian v. Gen. Elec. Co.,* 23 Mass.App.Ct. 538, 503 N.E.2d 1318 (1987)).

■ Therefore, a collection of minor, possibly harassing incidents cannot be sufficient to satisfy the definition of threatening or coercive conduct under MCRA, especially where there is little evidence of any intent by Plaintiff's superiors to intimidate him. *See, e.g., Carmack v. Amtrak,* 486 F.Supp.2d 58, 92 (D.Mass.2007) (dismissing MCRA claim where Amtrak inves-

tigated incidents and found legitimate grounds to discipline the employee-plaintiff and "[n]othing in the record indicate[d] that Amtrak's true motivation was to punish [plaintiff] for communicating with his union representative or for exercising his right to free speech"); *Fletcher v. Szostkiewicz,* 190 F.Supp.2d 217, 232 (D.Mass. 2002) (criticizing "pattern of harassment" as possible basis for a finding of threatening behavior). *Compare Howcroft v. City of Peabody,* 51 Mass.App.Ct. 573, 594, 747 N.E.2d 729 (2001) (ruling that tactics were intended to intimidate where officer who complained about smoking in station in violation of articulated policy was subject to harassment including blowing smoke in his face, telling him to "shut up," reassigning him to the smoky area, and bad faith attempts to deprive him of benefits to which he was later found entitled).

■ The only incident that gives the court pause is the November 2003 meeting with Patterson at which she slapped her hands on the table and shouted at Plaintiff in context of a discussion that touched, among other things, on his request for his personnel file. Massachusetts law requires that an employer provide an employee with his or her personnel file upon written request. This outburst of temper on Patterson's part, though it approaches the line, is not sufficient to constitute the sort of threatening or intimidating behavior the statute requires.

■ MCRA requires that a plaintiff's perception of a threat, intimidation, or coercion be objectively reasonable. *Haufler v. Zotos,* 446 Mass. 489, 845 N.E.2d 322, 335 (2006). A single physical gesture and comment, unless more overtly physically or verbally threatening than those in this case, cannot form the basis of an objectively reasonable belief of harm.[5] *Cf.*

---

**5.** This determination is bolstered by the fact

that nothing in the record indicates that Pat-

*Horne v. City of Boston,* 509 F.Supp.2d 97, 115 (D.Mass.2007) (holding that even deliberately false complaints about a plaintiff's job performance did not constitute coercive behavior under MCRA); *Cignetti v. Healy,* 89 F.Supp.2d 106, 125 (D.Mass. 2000) (disregarding fact that plaintiff found remark that "I should just shoot you" intimidating where evidence indicated it was meant in a joking manner); *Planned Parenthood League v. Blake,* 417 Mass. 467, 631 N.E.2d 985, 990–91 & n. 9 (1994) (contrasting threatening behavior of physically obstructing access to property and deliberately crowding plaintiff with non-threatening behavior of "lecturing [or] picketing" without the promotion of physical contact). Indeed, if an unpleasant interaction of this sort were sufficient to satisfy the statute, few employment relationships would lack episodes that were actionable under MCRA.

■■■ With regard to Plaintiff's common law claim for discharge in violation of public policy, the first requirement is that Plaintiff, in fact, be discharged. In this case, since Plaintiff tendered his resignation, he may prevail on this claim only if he can show a constructive discharge. In order to do this, he must point to evidence of record that would be sufficient to convince a reasonable jury that his "working conditions would have been so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign...." *GTE Prods. Corp. v. Stewart,* 421 Mass. 22, 653 N.E.2d 161, 169 (1995).

"[M]ere dissatisfaction with the nature of assignments, criticism of an employee's performance and dissatisfaction with compensation have been held insufficient to establish a triable question of fact on the issue of constructive discharge." *Id.* Nothing in the record of this case would justify a jury in reasonably concluding that Plaintiff's working conditions reached anything approaching the level of intolerability required to provide a basis for a claim of wrongful discharge. Plaintiff's own conduct in attempting to rescind his resignation only confirms that his subjective feelings were consistent with this objective view of the record. He wished to return.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. No. 13) is hereby ALLOWED. Plaintiff's sense of indignation may be sincere, and his counsel's efforts have been resourceful and vigorous. Nevertheless, it would be false charity to permit this case to go forward where the record is simply inadequate as a matter of law to support the claims. The clerk is ordered to enter judgment for Defendant. This case may now be closed.[6]

It is So Ordered.

---

terson's behavior was designed to induce Plaintiff specifically to retract his request for his personnel file. Patterson's own testimony indicates she merely lost her temper due to Plaintiff's general comments, not his request for his personnel file. (*See* Dkt. No. 19, Ex. 36, Patterson Dep. 123:17–24.) Nothing in the record contradicts her description of this incident.

6. Defendant's Motion to Strike (Dkt. No. 25) and its Motion to Strike Opposition to its Motion to Strike (Dkt. No. 32) have both been denied as moot, since nothing in any of the filings Defendant seeks to strike would affect the court's ruling. In making these rulings, however, the court is not intending to suggest that all of the disputed material would have been admissible at trial; had the case reached that stage.